UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

DAVID OWENS,                          )
                                      )
        *Plaintiff*,                  )
                                      )        Case No. 1:08-cv-287
v.                                    )        Judge Mattice
                                      )
ROLLINS, INC., ROLLINS, INC. LONG     )
TERM DISABILITY PLAN, PROVIDENT       )
LIFE AND ACCIDENT INSURANCE           )
COMPANY, UNUM LIFE INSURANCE          )
COMPANY OF AMERICA,                   )
UNUMPROVIDENT LIFE INSURANCE          )
COMPANY, UNUMPROVIDENT                )
CORPORATION, UNUM LIFE OF             )
AMERICA INSURANCE COMPANY,            )
UNUM GROUP, and UNUM GROUP            )
CORPORATION,                          )
                                      )
        *Defendants*.                 )

## MEMORANDUM AND ORDER

Plaintiff David Owens brought this action against Rollins, Inc., Rollins, Inc. Long Term Disability Plan, Provident Life and Accident Insurance Company, Unum Life Insurance Company of America, UnumProvident Life Insurance Company, UnumProvident Corporation, Unum Life of America Insurance Company, Unum Group, and Unum Group Corporation.[1] Plaintiff alleges a cause of action under 29 U.S.C. § 1132 and seeks judicial review of a termination of long-term disability ("LTD") insurance benefits under the Plan, which took effect as of December 27, 2007. [Court Doc. 1, Compl.]

Before the Court are Plaintiff's Motion for Judgment on the Pleadings [Court Doc. 18] and Defendants' Motion for Judgment on the Pleadings [Court Doc. 24].

---

[1] The Court will generally refer to these parties collectively as "Defendants" or "Unum" throughout.

For the reasons stated below, the Court will **GRANT** Defendants' Motion for Judgment on the Pleadings [Court Doc. 24] and **DENY** Plaintiff's Motion for Judgment on the Pleadings [Court Doc. 18].

## I.    STANDARD OF REVIEW

A claim under 29 U.S.C. § 1132(a)(1)(B) for denial of benefits is to be reviewed "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the administrator or fiduciary is afforded discretion by the plan, the decision is reviewed under the arbitrary and capricious standard. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006). The Plan documents here assert that the Plan administrator has discretion to "control, manage, and administer claims, and to interpret and resolve all questions arising out of the administration, interpretation, and application of this Policy." (Administrative Record PLACL ("AR") at 00083; AR LTD at 00033.)[2] This Court will therefore conduct its review under the arbitrary and capricious standard.

Under 29 U.S.C. §1132(a)(1)(B), a court's review is limited to the administrative record as it existed when the plan administrator made its final decision. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378-79 (6th Cir. 2005).[3] Arbitrary and capricious is one of

---

[2]    The Court will refer to all documents in the record marked PLACL generally as "AR." The documents marked LTD and PLAMS will be cited as AR LTD or AR PLAMS.

[3]    This presents an issue as it pertains to Court Doc. 25-3 and Court Doc. 33-1, documents which memorialize Plaintiff's attempt to receive Social Security Disability Benefits. Court Doc. 25-3 is the ALJ's decision denying benefits, submitted by Defendants, while Court Doc. 33-1 was filed by Plaintiff and is the Order reversing the Commissioner's decision and awarding benefits. The Court notes that Plaintiff initially (and rather strenuously) objected to Defendants' attachment of the unfavorable decision because that decision took place after

the least demanding forms of review. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). "Nevertheless, merely because our review must be deferential does not mean our review must also be inconsequential." *Id.* A court must "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Id.* at 172. If the administrative record does not show that the administrator offered a "reasoned explanation" based on substantial evidence, the decision is arbitrary or capricious. *Moon*, 405 F.3d at 379. Substantial evidence means "much more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McDonald*, 347 F.3d at 171.

Plaintiff asserts that Defendants bear the burden of proof in this case because the limitation on benefits for Mental and Nervous conditions is a coverage exclusion and an affirmative defense to coverage; therefore, application of the exclusion must be established by Defendants. (Court Doc. 19, Pl.'s Mem. in Supp. of Mot. for J. on the Pleadings at 12-13.) Defendants do not appear to contest this characterization, and the United States Court of Appeals for the Sixth Circuit has stated that "the administrator of an ERISA-regulated plan has the burden to prove exclusions from coverage." *Caffey v. Unum Life Ins. Co. of Am.*, 107 F.3d 11 (Table), 1997 WL 49128, at *3 (6th Cir. Feb. 3, 1997).[4]

---

Defendants made their decision on Plaintiff's LTD benefits claim. Plaintiff later filed the favorable decision and apparently would like for the Court to consider that award of SSDI benefits in making its determination. The law is clear, however, that the Court must not consider either document because neither document was part of the administrative record when Defendants made the decision to terminate benefits.

[4] *Caffey* was distinguished by *Klein v. Cent. States, Se. & Sw. Areas Health & Welfare Plan*, 346 F. App'x 1 (6th Cir. 2006) on this exact point. *Caffey* used common law trust principles to reach the conclusion on the burden of proof, but the *Klein* court acknowledged that federal courts could not use common law principles in place of the express terms of the Plan. *Klein*, 346 F. App'x at 6. In *Klein*, the Plan documents expressly stated that the burden of proof was on the claimant, and that explicit provision would control. In *Caffey*, in contrast, the Plan

Plaintiff also asserts that the Court must consider the inherent conflict of interest present because Defendants both make the disability determination and pay the benefits if the determination is favorable. (Pl.'s Mem. at 14-17.) Defendants acknowledge that this is a factor to consider in determining if the decision was arbitrary and capricious. (Court Doc. 25, Defs.' Mem. in Supp. of Mot. for J. on the Pleadings at 24-25.)

## II. FACTS AND PROCEDURAL HISTORY

### A. Medical History Predating the LTD Claim

As early as 2000, Plaintiff David Owens experienced dizzy spells with arm twitching, and he first sought treatment for these specific symptoms in March 2001. (AR at 00142-146.)[5] At the time, Plaintiff worked as a manager for Orkin Pest Control, a subsidiary of Rollins, Inc. (*Id.* at 00032, 00097.) Plaintiff's cardiologist referred him to neurologist Dr. Imdad Yusufaly for treatment of his dizziness and seizure-like symptoms. (*Id.* at 00142-146.) Dr. Yusufaly described Plaintiff's symptoms as follows:

> He says that for the last four months he has been having spells of dizziness . . . an ooziness where he just doesn't feel right. These can happen while he is driving, while he is sitting around, while he is in the kitchen, while he is in the shower. . . . When the spell is very intense, his left upper extremity will jerk. The jerking . . . can go on for a few minutes. There has never been any loss of consciousness or alteration of consciousness and he has always been "with it." He says the

documents had no such provision, and use of the common law principles was acceptable. *Id.*

In the instant case, the Court has reviewed the Plan documents and can find no express provision regarding the burden of proof; therefore, the Court will follow the general principle outlined in *Caffey* and place the burden of proof on Defendants.

[5] Plaintiff apparently reported to the emergency room before March 2001 and was referred to Dr. Narakanti Rao for an irregular heartbeat. (AR at 00145.) Dr. Rao performed two 24-hour Holter monitors on Plaintiff, but the results of the testing did not correlate to Plaintiff's other symptoms. (AR at 00142-146.)

> dizziness part where he feels different in his head can last for
> about an hour so.

(*Id.* at 00145.)  Plaintiff's visit on this occasion was prompted by a spell that had occurred the morning of March 26, and he indicated that he had been experiencing approximately two spells a week for the last four months.  (*Id.*)  Dr. Yusufaly believed that Plaintiff might be experiencing "partial simple motor seizures" and continued to see and evaluate Plaintiff for the next two years.  (*Id.*)

On April 16, 2001, Dr. Yusufaly noted that Plaintiff was continuing to have spells while driving and had a "heavy" one that morning.  (AR at 00141.)  On May 14, 2001, Plaintiff reported by phone that his new medication seemed to be working well and he had not had spells in three weeks; he also noted that the twitching was not impacting him.  (AR at 00140.)  It appears that an EEG was performed that day with some possible dysfunction and another was performed on May 21, 2001 based on a referral from Dr. Miller.  (*Id.* at 01537, 00308.)  The second EEG was normal during wakefulness, drowsiness and light sleep.  (*Id.* at 00308.)  Plaintiff also had a brain MRI on April 26, 2001 that was normal.  (*Id.* at 01687.)  On January 9, 2002, Plaintiff stated that the spells had increased to occur almost daily and he felt like his "head [was] floating off [his] neck" with palpitations and left shoulder twitching.  (*Id.* at 00150.)  On February 6, 2002, the patient notes indicate that Plaintiff was feeling better and had reported that the seizures had dropped by 60%, were much less intense, and only happened while driving.  (*Id.* at 00139.)  On July 17, 2002, Plaintiff indicated that he had spells several times per week only when driving, and on October 2, 2002, Plaintiff stated that he got the jerks when he was in traffic, in the car for half an hour, or after seeing strobe lights.  (*Id.* at 00149.)  On February 12, 2003, Plaintiff

reported that the jerks were better controlled, although he still got a twitch in his left shoulder when he drove. (*Id.* at 00137.) It does not appear that Dr. Yusufaly ever diagnosed Plaintiff with any condition, and in early 2003, Dr. Yusufaly referred Plaintiff to Dr. Lori Uber-Zak, an assistant professor of neurology at Loma Linda University Hospital. (*Id.* at 00157-158.)

Dr. Uber-Zak's first impression was that Plaintiff was likely suffering from simple partial seizures, but she was not sure that they were truly seizures due to Plaintiff's poor response to several different anti-epileptic medications that Dr. Yusufaly had prescribed. (AR at 00157-158.) Because of this uncertainty, Dr. Uber-Zak sought to clarify the diagnosis with a video EEG and an MRI. (*Id.*) Plaintiff thereafter had his first video EEG in November 2003, and Dr. Uber-Zak noted that "[n]one of the patient's typical index events were captured. The patient reported 2 events . . . . The second spell has an isolated left shoulder twitch but nothing was seen clinically or on the EEG. . . . Thus the study is nondiagnostic." (*Id.* at 00298.) Dr. Uber-Zak did note that Plaintiff experienced some abnormal heartbeats during the testing and that cardiac evaluation might be necessary. (*Id.*) In April 2004, Dr. Uber-Zak referred Plaintiff to Dr. David Swope for an opinion on whether Plaintiff's symptoms could be caused by a movement disorder.[6] (AR at 00159.)

On June 29, 2004, Plaintiff came to the emergency room and reported an increase in the seizures and their intensity, including an event that day where he was driving and suddenly realized he had to stop the vehicle and had to swerve to avoid hitting vehicles.

---

[6] It does not appear from the record that Plaintiff was ever evaluated by Dr. Swope. (AR at 00608.) Records from Dr. Uber-Zak in June 2005, however, appear to reference Dr. Swope in regards to a video of Plaintiff driving, but there is no documentation of any visit to Dr. Swope in the record. (*Id.* at 00772.)

(AR at 00207.)  Plaintiff stated that the seizures occurred daily and would last from a minute to a day long.  (*Id.*)  Dr. Laura Nist admitted Plaintiff for a second video EEG that day, but Plaintiff did not experience any twitching or other symptoms during testing.  (*Id.* at 00204.) Dr. Nist wrote that the "episode resolved spontaneously before EEG connected" and that no further episodes were observed or recorded during the 16-hour test.  (*Id.* at 00206.)  Dr. Nist noted that Plaintiff presented with anxiety and indicated that Plaintiff should have a psychiatric evaluation for a driving phobia, but this suggestion was rejected by Plaintiff.  (*Id.* at 00206, 00225, 00608.)  Dr. Uber-Zak noted that none of the events captured during the video EEG were epileptic and that Plaintiff indicated they were brief and slight compared to what he usually experienced.  (*Id.* at 00301.) Dr. Uber-Zak further noted that there might be a cardiac cause.  (*Id.*)  A third video EEG was performed on July 2, 2004, but Dr. Uber-Zak wrote that "no definite arm jerks were noted" and "with most of the events, there was no mention of what the patient was experiencing on the video" but that "[f]urther cardiac evaluation may be warranted."  (*Id.* at 00303-306.)

To follow up on Dr. Uber-Zak's suspicion that there might be a cardiac cause, Plaintiff saw Dr. Robert Marsa on July 6, 2004 for cardiac testing.  (AR at 00469-70.)  Dr. Marsa stated that Plaintiff did have a fair number of PVCs (premature ventricular complexes) but that he was "mildly uncertain as to what to make of [Plaintiff's] symptoms." (*Id.*)  Dr. Marsa further noted that the events Plaintiff described "do not sound very typical for arrhythmia symptoms."  (*Id.*)  Plaintiff was fitted with a heart monitor for one month, and at the end of the month, Dr. Marsa wrote that there was "[n]o arrhythmia seen which would normally require treatment" and "[n]o consistent correlation of arrhythmia and 'dizziness.'"

(*Id.* at 00473.)

**B.    Claim for LTD Benefits**

Plaintiff's last day of work was June 30, 2004 and he claimed disability as of July 1, 2004.  (AR at 00032, 00039.)  Plaintiff's application for LTD benefits was submitted to Unum in September 2004, and Plaintiff supplemented his application with an Attending Physician Statement ("APS") from Dr. Uber-Zak.  (AR PLAMS 00036, 49.)  In the APS, Dr. Uber-Zak wrote that Plaintiff's diagnosis was "seizures" and that his symptoms were left shoulder jerking and dizziness.  (*Id.* at 00049.)  Dr. Uber-Zak's notation under "Objective Findings" appears to reference left temporal sharps from an ambulatory EEG, although documentation of Plaintiff's ambulatory EEG is not found in the record.[7]  (*Id.*)  Under Restrictions, Dr. Uber-Zak wrote that Plaintiff should not do anything "where loss of control is an issue" and under Limitations, Dr. Uber-Zak wrote that Plaintiff had "cardiac limitations per cardiologist" and that Plaintiff "can't fully do work when dizzy."  (*Id.*)   Unum began paying Plaintiff LTD benefits under a Reservation of Rights in December 2004 and required Plaintiff to submit a Supplemental Statement and a new APS by early January 2005.  (AR at 00414.)  In January, Dr. Uber-Zak filled out a Functional Abilities Form but indicated in most places that Plaintiff's cardiologist should address his functional abilities because from her standpoint, Plaintiff was not limited by his seizures unless he was driving.  (*Id.* at 00447-448.)  Dr. Uber-Zak also filled out another APS, which was similar to the one she completed in October 2004.  (*Id.* at 00455.)  Dr. Uber-Zak continued to reference Plaintiff's

---

[7]    Dr. Uber-Zak referred Plaintiff to Dr. Jordan for an ambulatory EEG on April 28, 2004.  (AR at 00159.)  She later commented on the results during a conversation with Dr. Horne in March 2005, stating that it resulted in some "left temporal sharps" but otherwise "did not match his clinical picture."  (*Id.* at 00596.)

cardiac problems and indicated that she was "still trying to treat the condition" and "doing more diagnostic tests," but hoped that Plaintiff would ultimately be able to return to work. (*Id.*)

In March 2005, Unum Medical Director Dr. Tanya Horne reviewed Plaintiff's claim and contacted Dr. Uber-Zak for more information because Plaintiff's diagnosis was unclear. (AR at 00595-597.) Dr. Uber-Zak told Dr. Horne that Plaintiff probably had "reflex epilepsy" with simple partial seizures with a motor manifestation, but that it was very difficult to determine a diagnosis because all of the testing had been unsuccessful. (*Id.*) Dr. Horne concluded that there was support for the restriction and limitation that Plaintiff could not drive until his seizures were controlled and noted that Plaintiff had no restrictions from a cardiac standpoint. (*Id.*) Based on this conclusion, Unum approved Plaintiff's LTD benefits for one year under an "own occupation" definition and informed Plaintiff that once the "own occupation" benefits expired, Plaintiff would have to show disability for "any occupation." (*Id.* at 00601-602.)

To continue to substantiate Plaintiff's condition, Dr. Uber-Zak submitted a Supplemental APS and another Functional Abilities Form in May 2005. (AR at 00669-670.) Because Dr. Uber-Zak had not seen Plaintiff since October 2004, the information is much the same as the information contained in her previous APS forms submitted in January and March 2005. This time, however, Dr. Uber-Zak said that Plaintiff's return to work "may not be possible" and that Plaintiff was limited in that he could not do "anything that would be impaired by the dizziness." (*Id.*) Dr. Uber-Zak continued to state that Plaintiff had a cardiac condition and that his limitations were best addressed by his cardiologist. (*Id.*) Dr.

Uber-Zak saw Plaintiff twice in June 2005 but was still unable to reach a definitive diagnosis, noting that Plaintiff may have myoclonus, a movement disorder. (*Id.* at 00771-776.) Dr. Uber-Zak wrote that Plaintiff needed an MRI of his cervical spine to rule out spinal myoclonus, but because Plaintiff did not have insurance, he could not have an MRI performed. (*Id.*)

In September 2005, Unum began paying Plaintiff LTD benefits under a Reservation of Rights pending evaluation of his claim under the "any occupation" standard. (AR at 00861.) Unum performed a vocational assessment as part of its evaluation of Plaintiff's claim and identified three occupations that could accommodate Plaintiff's driving restriction and his prior work history. (*Id.* at 00880-883.) Dr. Uber-Zak wrote to Unum in November 2005 and stated that Plaintiff "has a condition with dizziness and jerking of his left upper extremity. The thought is that these are probably seizures. They may also be some type of movement disorder. We have been unable to catch these at the time of testing in the hospital." (*Id.* at 00930.)

Plaintiff saw Dr. Uber-Zak again in January 2006 but she was still unable to pin down a diagnosis. (AR at 00952-953.) Dr. Horne reviewed Plaintiff's file again as part of the "any occupation" evaluation and concluded that Plaintiff should be able to return to work in a position that did not involve driving or being at heights. (*Id.* at 00995.) Dr. Horne also sent a letter to Dr. Uber-Zak to inquire as to her opinion about his ability to return to work, and Dr. Uber-Zak wrote that she was "not entirely sure if he would be able to meet his job requirements if it flares up" and that they have still not found a diagnosis. (*Id.* at 01011-1012.) After this communication, Dr. Horne recommended that Plaintiff undergo an

independent medical examination ("IME").  (*Id.* at 01015, 01019.)

Plaintiff attended an IME with Dr. Thomas Arnold on June 14, 2006.  (AR at 01041.)

During the IME, Plaintiff reported that he had 6-10 episodes per day which can last from

2 minutes to 6-8 hours.  (*Id.* at 01075.)  Plaintiff described some of the triggers as driving,

flashing lights, motion, stress, and computer screens but reported that he had only lost

consciousness during two of the episodes.  (*Id.*)  In his evaluation, Dr. Arnold wrote, in part:

> I doubt that this patient has epilepsy. . . . It seems very strange
> to me that he reports having 6-10 episodes per day, yet he had
> no episodes on two different hospitalizations for EEG/Video
> monitoring.
>
> His neurologist in CA has mentioned the possibility of
> myoclonus.  She has recommended referral to a movement
> disorder specialist for this possibility.  I really wouldn't expect
> vertigo to be associated with segmental cervical spine
> myoclonus.
>
> The patient has never been seen by a psychiatrist.  He has
> never had neuropsychological testing.  I would recommend
> neuropsychological testing and referral to a psychiatry.

(*Id.* at 01077.)  Dr. Arnold agreed that Plaintiff needed another MRI of the brain and

cervical spine to rule out multiple sclerosis and a possible movement disorder.  (*Id.*)

Because of Dr. Arnold's recommendation that Plaintiff undergo neuropsychological testing,

Unum continued paying benefits under the "any occupation" definition and referred Plaintiff

to Dr. Brad Roper for a neuropsychological IME.  (*Id.* at 01107, 01151, 01166-1168.)

At this IME, which took place over two days in January 2007, Plaintiff reported that

he experienced "increased heart rate, a 'drunk feeling,' tightness in his extremities, sweaty

palms, slightly blurred vision, and twitching in the left shoulder" during the spells, and that

they might last from 10 minutes to 6 hours or continue over several days.  (AR at 01250.)

Plaintiff also reported that he experienced milder versions of the spells frequently and felt dizzy at some point during most days. (*Id.*) Dr. Roper noted that Plaintiff seemed "moderately anxious" and displayed "mildly elevated anxiety" throughout the examination. (*Id.* at 01248.) In his report, Dr. Roper summarized his findings, in part, as follows:

> In light of the absence of any measured impairments, the insured does not meet criteria for any neurocognitive disorder.
>
> . . .
>
> Personality assessment, reviewed above, does not show any evidence of symptom magnification and is consistent with, although not diagnostic of, a somatoform disorder. Regarding interview and medical records, his history in terms of the development of his difficulties does not present a clearly identified stressor as the initiator of his symptoms, nor is there a clear relationship between stress level and the manifestation of severe spells over time. At the same time, the insured clearly shows somatic preoccupation, and preoccupation with the common visual stimuli that the insured believes contributes to spells. Various aspects of his presentation, such as his affability and animation combined with apparent behavioral signs of anxiety, combine with formal personality assessment results to suggest that at least a substantial portion of his physical symptom manifestation is related to psychological factors.

(*Id.* at 01254-1255.) As a result of this assessment, Dr. Roper diagnosed Plaintiff on Axis I with Undifferentiated Somatoform Disorder.[8] (*Id.* at 01255.) Dr. Roper further noted that "[a]lthough it is not possible to rule out general medical or neurological contributors to the

---

[8] The Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-IV) states generally that Somatoform Disorders involve "the presence of physical symptoms that suggest a general medical condition (hence, the term *somatoform*) and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder. . . there is no diagnosable general medical condition to fully account for the physical symptoms." (Court Doc. 25-1, DSM-IV p. 485.) Undifferentiated Somatoform Disorder is defined as "unexplained physical complaints, lasting at least 6 months, that are below the threshold for a diagnosis of Somatization Disorder." (*Id.*)

insured's impairments, it appears quite likely that he manifests a somatoform disorder that contributes to spells and associated physical symptoms. Given the diagnostic uncertainties surrounding the spells, it is of course difficult to delineate which symptoms are primarily psychological from those that might be primarily neurological." (*Id.* at 01256.) Dr. Roper acknowledged that there were still questions regarding the cause of Plaintiff's spells and that the symptoms represented a diagnostic challenge, but indicated that he believed that Plaintiff might benefit from supportive psychotherapy. (*Id.*) Dr. Roper finally noted that he did not believe Plaintiff would be able to return to his prior level of functioning. (*Id.*)

Following the IME with Dr. Roper, Dr. Tom McLaren with Unum reviewed Plaintiff's file and consulted with Dr. Roper by phone. (AR at 01266.) Dr. McLaren noted that Dr. Arnold, who completed the first IME with Plaintiff, had been unable to identify a diagnosis of seizures and recommended that Plaintiff undergo a neuropsychological IME. (*Id.*) After consulting with Dr. Roper, Dr. McLaren noted that Dr. Roper "stated the claimant met criteria for a somatoform disorder (exhibits symptoms and belief of illness despite lack of ability to define that illness)" and indicated that this disorder would interfere with Plaintiff's ability to function in the workplace. (*Id.* at 01266-1267.) Dr. McLaren agreed with Dr. Roper's conclusion and wrote:

> These data indicate no evidence of cognitive or neurologically based impairments, however do identify a somatic disorder. It is important to note that if a medically based disorder is identified by his medical providers, then this diagnosis would not apply. However, given the inability to either the AP or neurology IME to specify a neurological process, this would be the only reasonable diagnosis at this point.
>
> Somatoform disorders at this level are considered disabling,

given the individual's continued extreme somatic focus which interferes with their own belief system that they are well enough to not have the physical symptoms to work.

(*Id.* at 01267.) Dr. McLaren referred the file back to Dr. Horne to address when Plaintiff's somatic condition might have started. (*Id.*) Dr. Horne noted that Plaintiff's treating provider did not have a diagnosis and Plaintiff had never been diagnosed definitively with seizures. (*Id.* at 01271-1272.) Dr. Horne had the results of the IMEs sent to Dr. Uber-Zak, and after reviewing these reports, Dr. Uber-Zak indicated that she still did not have a diagnosis for Plaintiff and could not opine on his ability to return to work because she had not examined him recently. (*Id.* at 01271-1272, 01303.) Dr. Uber-Zak did not comment on the diagnosis of Somatoform Disorder or Dr. Arnold's recommendation that Plaintiff consult with a psychiatrist. (*Id.* at 01303.)

Meanwhile, Plaintiff had moved to Memphis, Tennessee and was under the care of Dr. Michael Wallace, a general practitioner. Dr. Wallace wrote to Unum on May 10, 2007 and stated that "[a]fter reviewing [Plaintiff's] records, I do not feel that they have adequately ruled in or ruled out a seizure disorder. . . For this reason, I can only, at this time, recommend that he receive further work-up for this disorder, until they have conclusively ruled in or ruled out a seizure disorder and/or addressed treatment for the causality of his symptoms." (AR at 01308.)

Because the physicians who examined Plaintiff believed he needed further testing, Unum arranged for Plaintiff to undergo an MRI of his brain and cervical spine. (*Id.* at 01324.) The MRIs were performed on June 29, 2007 and both were normal. (*Id.* at 01367, 01385.) Dr. Horne reviewed the results and wrote that "[t]here is no evidence of pathology

in the cervical spine or MRI of the brain to explain the insured's symptomatology and findings appear to support the IME opinion of Somatoform Disorder." (*Id.* at 01389.)

Unum asked Dr. Arnold to review Plaintiff's neuropsychological IME and the MRI scans and write an addendum to his report on Plaintiff's first IME, and Dr. Arnold did so in September 2007. (AR at 01420.) Dr. Arnold wrote:

> I certainly agree with [Dr. Roper's] recommendations regarding psychotherapy. I still feel that the patient would benefit from psychiatric consultation as well. . . . The patient's MRI scans of the brain and cervical spine were normal. I was concerned that the patient might have a central nervous system disorder such as multiple sclerosis. There was no evidence on [sic] multiple sclerosis on these studies. . . . I still do not feel that the patient has epilepsy.

(*Id.*) Based on Plaintiff's diagnosis of Somatoform Disorder, Unum sent Plaintiff a letter dated December 27, 2007 to notify him that disability benefit payments would be terminated. (*Id.* at 01473-1478.) Unum explained that it made the determination that Plaintiff was no longer eligible for benefits because Somatoform Disorder was classified as a Mental and Nervous Disorder, and according to the terms of the Plan, the maximum LTD benefit for such disorders was 24 months. (*Id.* at 01476.) By this time, Plaintiff had received benefits for over three years, and Unum paid Plaintiff another three months as a courtesy at the time of termination. (*Id.*)

Plaintiff appealed the decision and Unum began reviewing his appeal in June 2008. (AR at 01515, 01521-1522.) In July, Plaintiff submitted a vocational evaluation completed by Mark Boatner, who relied on information and records from Dr. Uber-Zak. (*Id.* at 01713-1722.) Mr. Boatner concluded that Plaintiff "does not have the capacity to sustain any full-time regularly defined job that exists in the local or national economy." (*Id.* at 01722.) As

part of the review of Plaintiff's claim, Unum had Dr. Alan Neuren evaluate Plaintiff's file as a Reviewing Appeals Physician. (*Id.* at 01751.) Dr. Neuren reviewed all of Plaintiff's medical records and stated that Plaintiff's claim of having several spells a day which could last for hours was not credible and that because Plaintiff had been thoroughly evaluated for the condition, his continually normal test results and unsuccessful treatment "all indicate the claimant is having non-epileptic seizures i.e. not due to a physical condition." (*Id.* at 01755-1756.) Dr. Neuren also noted that Plaintiff had been evaluated for a cardiac condition but no such condition appeared to be present. (*Id.* at 01756.) Dr. Neuren therefore concluded that "[g]iven the lack of findings to support the presence of a physical condition (either cardiovascular or neurologic) other than hypertension, there is no basis for restrictions or limitations." (*Id.*)

On September 9, 2008, Unum denied Plaintiff's appeal and upheld its original decision. (AR at 01773-1777.) The denial letter invited Plaintiff to submit Dr. Uber-Zak's sworn statement within 30 days if it was based on "updated medical examination findings, medical testing or other corroborative data." (*Id.* at 01776.) Plaintiff did submit records from Dr. Wallace and a sworn statement from Dr. Uber-Zak, in which she stated that the diagnosis of Somatoform Disorder was premature because it is a "diagnosis of exclusion" and she was never able to rule out seizures. (*Id.* at 01794.) Dr. Uber-Zak stated that if she had been able to rule out seizures, she would have diagnosed Plaintiff with myoclonus, a movement disorder. (*Id.*) It is Dr. Uber-Zak's opinion that Plaintiff has a neurological disorder that is either seizures or a movement disorder, but not a psychological disorder. (*Id.* at 01797.)

Unum reviewed Plaintiff's claim again and Dr. Neuren reviewed the additional materials submitted after the first denial. (*Id.* at 01834, 01844-1845.) Dr. Neuren stated that Dr. Uber-Zak's opinion regarding myoclonus was not supported by the record and would not result in impairment even if it was a possible diagnosis. (*Id.* at 01844.) Moreover, Dr. Neuren noted that the diagnosis of Somatoform Disorder was not one of exclusion in Plaintiff's case because his symptoms are inconsistent with a seizure disorder or other physical condition and he demonstrated "somatic embellishment" during personality testing. (*Id.* at 01845.) Therefore, Dr. Neuren asserted that "there is overwhelmingly compelling data that indicate the insured's problems are not due to a physical condition." (*Id.*) Dr. Neuren concluded that "[p]sychological testing has established the presence of a somatoform disorder," while extensive testing and monitoring have failed to identify a physical condition to explain Plaintiff's symptoms or result in impairment. (*Id.*)

During the second review of Plaintiff's claim, Plaintiff also submitted a Medical Opinion Form filled out by Dr. Uber-Zak which states that Plaintiff has "possible seizures versus myoclonus and dizziness" and "heart problems," but remains largely vague about his limitations and makes no definitive diagnosis. (AR at 01858-1859.) By letter dated October 23, 2008, Unum upheld its denial of Plaintiff's claim and this lawsuit followed. (*Id.* at 01867-1869.)

## III. ANALYSIS

Plaintiff asserts generally that he is disabled for "any occupation" and that Defendants acted arbitrarily and capriciously in denying his benefits. (Pl.'s Mem. at 17.)

Plaintiff argues that Defendants previously found him disabled under the "any occupation" standard and cannot dispute this determination; furthermore, Plaintiff argues that the only reason that his benefits were discontinued is due to an improper and incorrect diagnosis of Somatoform Disorder, which was categorized as a Mental and Nervous condition and resulted in a 24 month limitation on benefits. (*Id.* at 17-24.)

The Court takes note of the Plan provisions which set forth a limitation for Mental and Nervous Disorders, as reproduced below:

> Payment of LTD Monthly Benefits is limited to the duration shown in **Section II - Schedule of Insurance** for each Disability caused or contributed to, directly or indirectly, by a Mental or Nervous Disorder.
>
> . . .
>
> Mental and Nervous Disorders mean physical, mental, emotional, behavioral, or stress-related disorders caused or contributed to, directly or indirectly, by a mental or nervous condition as classified in the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM) in effect as of the Date of Disability.

(AR LTD 00025.) In the Schedule of Insurance, the Plan specifies that disabilities caused by a Mental and Nervous Disorder are subject to a limitation and can only receive a maximum of 24 months of benefits. (*Id.* at 00016.)

Plaintiff essentially makes two arguments. First, Plaintiff claims that the diagnosis of Somatoform Disorder is inconsistent with the record and at odds with the opinion of Dr. Uber-Zak, and that Defendants improperly relied on the evaluations of Dr. Neuren and Dr. McLaren in reaching its decision. (Pl.'s Mem. at 19.) Plaintiff points primarily to Dr. Uber-Zak's statement that if she could rule out seizures as a diagnosis, she believes that he has a movement disorder, to support his contention that he suffers from a physical condition.

(*Id.* at 20.)  Plaintiff also argues that the diagnosis of Somatoform Disorder was arrived at erroneously because it all began with reliance on the statement of Dr. Roper that Plaintiff's symptoms were consistent with, but not diagnostic of, the disorder.  (*Id.*)  Instead of accepting Dr. Uber-Zak's opinion that Plaintiff suffered from a physical condition and not a psychological disorder, Defendants relied on Dr. Roper's statement and the improper diagnosis escalated from there.  (*Id.* at 20-21.)  Plaintiff further asserts that Defendants' reliance on Dr. Neuren is misplaced because he is not a treating physician, did not examine Plaintiff, and his opinion is contrary to consistent evidence in the record.  (*Id.* at 21-23.)

Plaintiff also argues that Defendants acted arbitrarily and capriciously because benefits were terminated for one reason and another reason was offered during the appeal process.  (Pl.'s Mem. at 23-24.)  Plaintiff claims that the definition of Somatoform Disorder relied upon by Unum changed throughout the process and resulted in a "moving target" for Plaintiff, making it difficult for him to successfully appeal his claim.  (*Id.* at 24-25.)

The Court will first determine if substantial evidence supports Plaintiff's diagnosis of Somatoform Disorder and will then review the explanations provided for the denial of Plaintiff's claim to address Plaintiff's arguments in that regard.

### A.    Diagnosis of Somatoform Disorder

Although Plaintiff claims that Dr. Roper only stated that his symptoms were consistent with Somatoform Disorder and not diagnostic, Dr. Roper *did* diagnosis Plaintiff on Axis I with Undifferentiated Somatoform Disorder and stated that Plaintiff "clearly shows some somatic preoccupation. . . . Various aspects of his presentation . . . combine with

formal personality assessment results to suggest that at least a substantial portion of his physical symptom manifestation is related to psychological factors." (AR at 01255.) Therefore, Plaintiff's argument that the diagnosis is improper because Defendants' reviewing physicians relied on a statement rather than an actual diagnosis is not entirely accurate. Dr. Roper's statements regarding his examination of Plaintiff and his arrival at the Somatoform Disorder diagnosis were reviewed by Dr. McLaren and Dr. Horne, who agreed that the record supported a diagnosis of Somatoform Disorder, and Dr. Arnold, who agreed that Plaintiff could benefit from psychotherapy or a psychiatric consultation. (*Id.* at 01267, 01389, 01420.) Dr. Neuren later reviewed Plaintiff's file during the appeals process and also agreed with the diagnosis. (*Id.* at 01845.)

The Court recognizes that the question before it is fairly narrow. The Court must determine if Defendants acted arbitrarily and capriciously in diagnosing Plaintiff with Somatoform Disorder and denying LTD benefits based on the categorization of this diagnosis as a Mental and Nervous Disorder. It is not for the Court to determine if Plaintiff actually suffers from any condition or if his complaints are credible; the Court will merely determine if Defendants' diagnosis and decision are or are not supported by the evidence in the record such that the decision was or was not arbitrary and capricious.

Proceeding with that understanding, the Court finds that the diagnosis of Somatoform Disorder was appropriate under the circumstances of this case and is supported by substantial evidence. The Court has reviewed the extensive record in this case, and it is apparent that Plaintiff was examined and tested countless times beginning in 2001 in an attempt to determine a physical cause for his symptoms. None of the diagnostic testing or examinations, however, ever resulted in a definitive physical diagnosis

to explain Plaintiff's symptoms. Several different types of EEG testing were performed on Plaintiff over the years, but none of this testing ever picked up any sign of epileptic seizures; Plaintiff was referred to a cardiologist who found no cardiac cause for his complaints after multiple occasions of heart monitor testing; Plaintiff had normal MRIs of the brain and cervical spine over a period of years; and Plaintiff was fully evaluated in both an IME and a neuropsychological IME, neither of which identified any physical condition to account for his symptoms.

In making the argument that the diagnosis is improper, Plaintiff relies generally on records from Dr. Uber-Zak and, in part, on Dr. Uber-Zak's statement that Plaintiff's condition is difficult to confirm through objective testing because there is no way to set up an EEG in a car. (Pl.'s Mem. at 26; AR at 00596.) One of the medical records from Dr. Uber-Zak, however, does reference watching a video of Plaintiff driving, without any indication that this video was determinative of a seizure disorder or any other diagnosis. (AR at 00772.) In addition, although Dr. Uber-Zak consistently referred to Plaintiff's cardiac problems on multiple APS documents and Functional Abilities Forms submitted to Defendants, the records show that Plaintiff does not have a cardiac condition, and her belief that he does appears to be misplaced. (AR PLAMS at 00049, AR at 00447-448, 00455, 00669-670, 01858-1859, 00469-470, 00473.) Dr. Uber-Zak also wrote in nearly every APS that Plaintiff experienced left temporal sharps during an ambulatory EEG, but the records from this testing are not included in this record, and the Court has no way to substantiate this result. (AR PLAMS at 00049, AR at 00455, 00669-670.) In any event, the results from this EEG were clearly not sufficient to definitively diagnose Plaintiff with a seizure disorder, because Dr. Uber-Zak has never been able to diagnosis Plaintiff with

any condition, and she told Dr. Horne that the results of the ambulatory EEG did not match Plaintiff's clinical picture. (AR at 00595-597, 00771-776, 00952-953, 01011-1012, 01303, 01858-1859.)

Plaintiff also relies heavily on Dr. Uber-Zak's sworn statement of June 26, 2008. (Pl.'s Mem. at 19-20.) In this statement, Dr. Uber-Zak asserted that the diagnosis of Somatoform Disorder was premature because it was a diagnosis of exclusion, and if she could rule out a seizure disorder, she would diagnose Plaintiff with myoclonus, a movement disorder. (AR at 01793-1794.) This, too, is not well supported by the record because it appears to be at odds with other statements Dr. Uber-Zak made in the course of Plaintiff's treatment. In particular, Dr. Uber-Zak stated at one point that Plaintiff needed an MRI of his cervical spine to rule out spinal myoclonus, but Plaintiff had a normal MRI of his cervical spine at Unum's expense on June 29, 2007. (AR at 00771-776; 01385). Dr. Arnold was also of the opinion that an MRI of the cervical spine might rule out myoclonus. (*Id.* at 01077.) Therefore, the basis for Dr. Uber-Zak's statement that Plaintiff might still be diagnosed with myoclonus is unclear, and the fact remains that Dr. Uber-Zak was never able to identify a physical condition to explain Plaintiff's symptoms during the five years of treatment which occurred before Defendants' final denial of his claim.

The Court acknowledges Dr. Uber-Zak's opinion that Plaintiff suffers from a physical condition and further acknowledges that she has treated him for a substantial amount of time; however, the vast majority of the medical evidence in the record does not support a physical disorder. It appears to the Court that many physicians did their best with various diagnostic tests to identify the cause of his symptoms, but after a remarkably extensive number of tests and examinations, no physical diagnosis has ever been adequately

identified. Simply put, none of Plaintiff's treating physicians could ever definitively diagnosis him with a physical condition that would explain his symptoms.

Plaintiff claims that the Somatoform Disorder diagnosis was only made in the absence of finding as to a physical condition, but in addition to the complete lack of objective findings to support a physical condition, there is some evidence which suggests that Plaintiff's problem may have a psychological cause. (Pl.'s Mem. at 26-27; AR at 01255.) As Defendant points out, many of the physicians involved in Plaintiff's case had suggested various psychological causes for his symptoms, and many of these suggestions occurred well before Dr. Roper's diagnosis of Somatoform Disorder. (Defs.' Mem. at 27; AR at 00225, 00470, 00595, 01077, 01254-1256, 01267, 01420, 01820, 01845.) Some of the physicians involved may have reached this conclusion based on an observed disconnect between Plaintiff's complaints and the repeatedly unsuccessful testing; Dr. Arnold, who performed the IME, was at a loss to explain how Plaintiff could subjectively claim to have multiple episodes per day, but not have any episodes during several episodes of EEG monitoring or lengthy physical examinations. (AR at 01077.) Dr. Neuren also found Plaintiff's subjective complaints regarding the frequency and duration of his symptoms to lack credibility as compared to normal diagnostic test results. (*Id.* at 01755-1756.) Dr. Roper directly found that Plaintiff exhibited "somatic preoccupation" and concluded that it was likely that a "substantial portion of his physical symptom manifestation [was] related to psychological factors." (*Id.* at 01255.) Indeed, Plaintiff's video EEGs with Dr. Uber-Zak contain several instances where Plaintiff indicated that he was experiencing symptoms but nothing was observed clinically or on the video. (*Id.* at 00297-306.)

-23-

The Court finds, however, that the diagnosis of Somatoform Disorder would still be supported even if it is a diagnosis of exclusion; that is, if it was only made in the absence of objective findings of a physical condition.  Plaintiff claims that the absence of a physical diagnosis is largely attributable to his lack of insurance, but during the pendency of this claim, Unum paid for Plaintiff to have two IMEs and MRIs of his brain and cervical spine in a continued attempt to find a diagnosis, and no physical condition was identified.  (Pl.'s Mem. at 20.)  Plaintiff had almost six years of diagnostic testing before his IME with Dr. Roper, and none of his physicians were ever able to arrive at a firm diagnosis.  The Court does not find that Defendants were simply reaching for any diagnosis when Dr. Roper performed his IME because the diagnosis of Somatoform Disorder was arrived at by an independent physician after two days of neuropsychological testing and the review of all of Plaintiff's medical records.  In any event, the fact that Somatoform Disorder *may* be a diagnosis of exclusion in this case is of no moment for the Court because the Court identifies no abuse of discretion in Defendants' acceptance of the diagnosis in either situation.

Again, the Court notes that it makes no finding as to Plaintiff's credibility or the presence or absence of the symptoms that Plaintiff describes.  The Court did not place undue weight, or much weight at all, on Dr. Neuren's review of Plaintiff's claim because it was unnecessary; the other evidence in the record was more than sufficient for the Court to conclude that Defendants did not act arbitrarily and capriciously when they accepted Plaintiff's diagnosis of Somatoform Disorder.  The record supports the conclusion that Plaintiff has not been diagnosed with any physical condition after several years of testing and many unsuccessful attempts to rule out various diagnoses.  In addition, the record

indicates that some of the physicians involved in Plaintiff's claim have identified potential psychological problems, and this possibility culminated in a diagnosis of Somatoform Disorder during Plaintiff's neuropsychological IME examination with Dr. Roper. Upon review of Plaintiff's record and the IME from Dr. Roper, Defendants' physicians agreed with this outcome, and the Court finds no error in this conclusion.

The additional records and information submitted by Dr. Uber-Zak during Plaintiff's appeal process do nothing more than state her opinion that Plaintiff suffers from a physical condition. The Court finds that Defendants did not act arbitrarily and capriciously in rejecting Dr. Uber-Zak's opinion that there was a physical cause in the absence of objective findings that can substantiate this opinion, particularly after multiple years of testing. The Court does not expect Defendants to accept Dr. Uber-Zak's opinion and reject the diagnosis of Somatoform Disorder when the evidence in the record does not support a diagnosis of any physical condition but does support a diagnosis of Somatoform Disorder. The Court therefore finds that Defendants made a reasoned decision in regard to Plaintiff's diagnosis and that substantial evidence exists to support this decision.

### B.    Denial of Plaintiff's Claim

The Court will now address Plaintiff's argument that Defendants acted arbitrarily and capriciously because the reason for the denial of benefits changed during the process as Defendants defined Somatoform Disorder in different ways.

As Plaintiff correctly points out, the Plan documents state that Mental and Nervous Disorders will be classified based on the DSM. (AR LTD at 00025.) The DSM-IV states generally that Somatoform Disorders involve "the presence of physical symptoms that suggest a general medical condition (hence, the term *somatoform*) and are not fully

explained by a general medical condition, by the direct effects of a substance, or by another mental disorder. . . there is no diagnosable general medical condition to fully account for the physical symptoms." (Court Doc. 25-1, DSM-IV p. 485.) Undifferentiated Somatoform Disorder is defined as "unexplained physical complaints, lasting at least 6 months, that are below the threshold for a diagnosis of Somatization Disorder." (*Id.*)

Plaintiff claims that the DSM states that "a somatoform diagnosis is only applicable if no physical explanation is found." (Pl.'s Mem. at 24.) This does not appear to be entirely accurate; rather, the DSM-IV states in the diagnostic criteria for Undifferentiated Somatoform Disorder that either of the following must be present:

> (1) after appropriate investigation, the symptoms cannot be fully explained by a known general medical condition or the direct effects of a substance (e.g., a drug of abuse, a medication)

> (2) when there is a related general medical condition, the physical complaints or resulting social or occupational impairment is in excess of what would be expected from the history, physical examination, or laboratory findings.

(DSM-IV at 492.) Therefore, it appears that a diagnosis of Somatoform Disorder could also be appropriate when a patient does suffer from a physical condition, but the severity of the symptoms cannot be explained by the underlying condition. In this case, however, it may be more accurate to described Plaintiff's diagnosis in the context of (1), above, because there is, thus far, an absence of any physical explanation for his symptoms.[9]

In Unum's first denial letter, Plaintiff's medical records were summarized at length

---

[9]    Dr. Roper acknowledged in his IME report, however, that "[a]lthough it is not possible to rule out general medical or neurological contributors to the insured's impairments, it appears quite likely that he manifests a somatoform disorder that *contributes* to spells and associated physical symptoms." (AR at 01256.) (emphasis added).

and Unum stated that Dr. Roper's neuropsychological IME had identified a somatic disorder.  (AR at 01475.)  The letter continues:

> It is important to note that if a medically based disorder is identified by your medical providers, then the diagnosis of Somatoform Disorder would not apply.  However given the inability of the Attending Physician, Dr. Lori Uber-Zak, the Primary Care Provider, Dr. Michael Wallace or the neurology IME of June 2006 to specify a neurological process, it appears that Somatoform Disorder would be the only reasonable diagnosis at this point.

(*Id.*)  Unum then explains the 24 month limitation on benefits for Mental and Nervous Disorders.  (*Id.* at 01475-1476.)  Unum's second denial letter states that the inability to come to a diagnosis after previous extensive testing "would all indicate that [Plaintiff] is having non-epileptic seizures that are not due to a physical condition . . . we have no recourse but to find the decision to apply the 24 month maximum benefit limitation for Mental and Nervous disorders to your client's claim." (*Id.* at 01776.)  Unum's third and final denial letter states as follows:

> [W]e appreciate your efforts in supplementing the record with additional medical documentation.  The records have lacked in quantifiable documentation of a seizure disorder.  Both our current medical reviews and prior IME findings suggest the alleged frequency of epileptic events should have been captured on the prior EEG monitoring.  Differential diagnoses are also not supported based on the overall medical findings.  Our position remains unchanged and the decision to deny benefits . . . remains upheld.

(*Id.* at 01868.)  The Court cannot find any significant inconsistency in the explanation of each denial that would suggest Defendants' decision to be arbitrary and capricious.

Plaintiff takes issue with Defendants' reliance upon Dr. Neuren's statements, but the Court does not find that Defendants unreasonably relied upon Dr. Neuren's opinion in

reaching the diagnosis of Somatoform Disorder and upholding the denial of benefits. Dr. Neuren was not involved in the initial denial of Plaintiff's claim for benefits and only reviewed Plaintiff's file on appeal. In contrast, the first denial, which was squarely based on Dr. Roper's diagnosis of Somatoform Disorder, relied entirely on Plaintiff's medical records and the reports of the two IMEs. (*Id.* at 01474-1475, 01774-1776, 01867-1868.) In the first denial letter, Unum summarized Plaintiff's medical records and explained the inability to identify a physical condition to account for Plaintiff's symptoms. (*Id.* at 01473-1478.) Dr. Neuren's opinions are only referenced in the second and third denial letters. Moreover, Plaintiff's characterization of Dr. Neuren's statements is not entirely accurate. Plaintiff argued that although the denial of his claim was premised on the notion that Somatoform Disorder was a diagnosis of exclusion and would only be appropriate in the absence of a medical diagnosis, Defendants then relied upon Dr. Neuren's statement that Somatoform Disorder was *not* a diagnosis of exclusion. (Pl.'s Mem. at 20-25.) In his report, Dr. Neuren wrote:

> Additionally the diagnosis of somatoform disorder is not one of exclusion. In addition to the insured's symptoms being inconsistent with a seizure disorder (spells lasting all day, spells caused by driving, normal EEG's, lack of any response to any anti-convulsant, lack of injury, normal EEG during the spells) the claimant also demonstrated a Conversion V on the MMPI-2 (an objective psychological battery that can assess somatic embellishment). Consequently, there is overwhelmingly compelling data that indicate the insured's problems are not due to a physical condition.

(AR at 01845.) The Court interprets Dr. Neuren's statement as an acknowledgment that, in some cases, a diagnosis of Somatoform Disorder is made when there is no other reasonable diagnosis or explanation for symptoms; in this case, however, Dr. Neuren

believed that there was independent evidence to support such a diagnosis aside from the fact that none of Plaintiff's physicians could identify a physical cause for his symptoms. Dr. Neuren's reasoning may be somewhat circular, but as the Court has previously noted, several of the physicians involved in Plaintiff's claim had recommended psychological or psychiatric evaluation as a possible explanation for his symptoms, and it is, at the very least, plausible to conclude that there is independent psychological evidence to substantiate the diagnosis in addition to the lack of evidence of any physical condition. This is slightly different from Dr. McLaren's conclusion, which was outlined in the first denial letter, but the fact remains that the basic explanation behind the diagnosis of Somatoform Disorder and the termination of benefits is the complete lack of objective findings to substantiate any physical condition.

The Court finds no evidence that Defendants changed their rationale at different stages of the claim process to make it difficult for Plaintiff to perfect his appeal. Nothing altered Plaintiff's opportunity to provide evidence that he suffered from a physical condition at each stage of the process, and providing such evidence was always the only possible way that Plaintiff could refute, in full or in part, the Somatoform Disorder diagnosis. The supplemental information submitted by Dr. Uber-Zak during this process, however, was in the same vein as the records and information available to Defendants when Plaintiff's claim was initially denied. In fact, this supplemental information was even less useful because Dr. Uber-Zak had not examined Plaintiff in quite some time, and the mere statement that she would diagnose Plaintiff with a movement disorder *if* she were ever able to rule out a seizure disorder was not adequate information with which to determine that Plaintiff suffers from a physical condition, particularly in light of Plaintiff's normal cervical spine MRI, which

presumably would have ruled out at least one form of myoclonus. Therefore, the Court finds that Dr. Neuren's review of this information and his conclusion did not differ significantly from the conclusion Defendants reached when they initially denied Plaintiff's claim.

The Court concludes that Defendants have presented sufficient evidence to meet their burden that the limitation for Mental and Nervous Disorders applies to Plaintiff's claim. The Court further concludes that the inherent conflict of interest present in this case does not change the Court's decision. Plaintiff did not point to any specific evidence that the conflict of interest amounted to an abuse of discretion,[10] and the Court can identify no bias which might have tainted the way that Defendants handled Plaintiff's claim. The Court considered the conflict of interest as a factor in the arbitrary and capricious standard, but it is not a factor which carries any weight. The Court finds that there was substantial evidence to support Defendants' position, and the mere existence of a conflict of interest is not enough to persuade the Court that Defendants acted arbitrarily and capriciously.

Because the Court has determined that Defendants did not act arbitrarily or capriciously in diagnosing Plaintiff with Somatoform Disorder and denying LTD benefits pursuant to the limitation of 24 months of benefits for Mental or Nervous Disorders, the Court will not address Plaintiff's argument as to Plaintiff's disability for "any occupation." This is an immaterial question to the Court because Plaintiff had received almost three years of benefits by the time the Mental and Nervous Disorder limitation applied and its

---

[10]     Plaintiff stated only that "[i]n general, Unum does have a pecuniary conflict of interest; it saves money by denying claims" and referenced past abusive claim tactics. (Pl.'s Mem. at 17.)

applicability to Plaintiff's claim is dispositive of the case.[11]

---

[11] The Court notes that Plaintiff relies primarily on a letter which purports to lift the Reservation of Rights for the "any occupation" benefits standard. (Pl.'s Mem. at 17; AR at 01166.) The letter does state that Defendants "have approved continued benefits and removed the Reservation of Rights that was applicable to prior payments" but it also indicates that Plaintiff "must continue to meet the policy definition of 'disabled' to maintain eligibility for benefits." (AR at 01166.) After citing from Plan language, the letter continues:

> Our decision to extend benefits into the any occupation period was based on the most recent medical information provided by your treating physician(s) and your June 2006 Independent Medical Examination. As you are aware we requested and received updated medical records from your Attending Physician, subsequently conducted an additional review of your claim and had you undergo a Neurological Independent Medical Examination. The Independent Neurologist concluded that we need you to undergo Neuropsychological testing in order to assist us in determining the severity of your deficits as they relate to your inability to return to work in any occupation for which you are suited by education, training, and experience.

> Our Independent Assessment Unit has scheduled your evaluation for January 4, 2007 and January 11, 2007.

(AR at 01167.) The Court interprets this letter as lifting the Reservation of Rights on the contingency that other testing was necessary to determine Plaintiff's ability to meet the "any occupation" definition. It seems clear to the Court that much of the difficulty surrounding the classification of Plaintiff's claim under "any occupation" was tied to the inability to diagnose Plaintiff with any condition, and the neuropsychological IME was intended to assist in that regard. Under the circumstances, the Court does not necessarily agree with Plaintiff that this letter can be accepted as unequivocal proof that Plaintiff met the "any occupation" definition for disability. Nonetheless, as the Court has already stated, it will not address the question of Plaintiff's disability for "any occupation" because it is an unnecessary inquiry for the Court to make in light of its determination that Defendants did not act arbitrarily and capriciously in diagnosing Plaintiff with Somatoform Disorder and denying benefits after the imposition of the 24 month limitation on benefits.

## IV.     CONCLUSION

Based on the foregoing, the Court **ORDERS** that Defendants' Motion for Judgment on the Pleadings [Court Doc. 24] is **GRANTED** and Plaintiff's Motion for Judgment on the Pleadings [Court Doc. 18] is **DENIED**.

A separate Judgment shall enter.

**SO ORDERED** this 27th day of September, 2010.

_____
*s/Harry S. Mattice, Jr.*
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE